UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HEAVENLY HANA LLC, et al.,

          Plaintiffs,

     v.

HOTEL UNION & HOTEL INDUSTRY OF
HAWAII PENSION PLAN,

          Defendant.

Case No. 14-cv-03743-JCS

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Re: Dkt. Nos. 61, 84

## I.    INTRODUCTION

1.    This case concerns efforts by Defendant and Counterclaimant Hotel Union & Hotel Industry of Hawaii Pension Plan (the "Plan") to collect withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") from Plaintiffs and Counter-Defendants Heavenly Hana LLC d/b/a Travaasa Hotel Hana, Green Tea, LLC d/b/a Green Tea Management, LLC, and Amstar-39, LLC (collectively, "Amstar").

2.    In May of 2010, Amstar purchased a hotel in Hana, on the island of Maui in Hawaii (the "Hotel"). The Hotel's previous owner, Ohana Hotel Company, LLC ("Ohana"), withdrew from the Plan immediately before the sale, triggering potential withdrawal liability under the MPPAA. The question before the Court is whether Amstar can be held liable as a successor to Ohana. Amstar contends that it cannot, arguing that the Plan's claim is barred by the doctrine of laches, that Amstar did not have actual notice of any liability, and that there was insufficient continuity of the business to find successorship.

3.    The parties waived their right to live testimony and stipulated that the case would be decided "based on pleadings, legal briefs, deposition testimony, affidavits and documents—a trial on the papers, allowing the Court to make factual findings." Stipulation (dkt. 51) ¶ 5.

4.    The Court heard argument on February 8, 2016. After considering and weighing

all the evidence and the parties' arguments, the Court enters the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).[1]

## II.    FINDINGS OF FACT

### A.    Stipulated Facts

#### 1. Parties and Other Relevant Entities

5.      Plaintiffs Travaasa, Green Tea, and Amstar-39 are each Colorado limited liability companies located in Denver, Colorado.  At all relevant times, Amstar-39 was the parent of Travaasa and Green Tea, and Travaasa and Green Tea were brother-sister companies under 26 C.F.R § 1.414(c)-2(c).  Joint Stipulation of Facts ("JSF," dkt. 62) ¶¶ 12−15.  No party has suggested that there is any relevant distinction between the three Plaintiffs for the purpose of this trial on the papers, and the Court therefore refers to Plaintiffs individually and collectively as "Amstar."

6.      AGL Acquisitions, LLC ("AGL") is a Colorado limited liability company utilized by Amstar to acquire the assets of Ohana.  *Id.* ¶ 16.

7.      Defendant, the Plan, is an employee benefit plan as defined in ERISA § 3(3), 29 U.S.C. § 1002(3).  It is an "employee benefit pension plan" as defined in ERISA § 3(2), 29 U.S.C. § 1002(2), and a "multiemployer plan" as defined in ERISA §§ 3(37) and 4001(a)(3), 29 U.S.C. §§ 1002(37) and 1301(a)(3).  JSF ¶ 27.  It primarily covers employees in the hotel and restaurant industry.  *Id.* ¶ 28.

8.      The Plan is maintained pursuant to the Labor Management Relations Act § 302(c), 29 U.S.C. § 186(c), and is jointly administered.  *Id.* ¶ 29.

9.      Benefit and Risk Management Services ("BRMS"), a third party employee benefit administrator headquartered in Folsom, California, served as third party administrator of the Plan at all relevant times.  *Id.* ¶¶ 33−34.  BRMS served as the custodian of records for the Plan.  *Id.* ¶ 33.

10.     Ohana operated the Hotel as the Hotel Hana Maui before the asset sale.  *See id.* ¶ 7.

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

11.     Ohana was an employer within the meaning of ERISA § 3(5), 29 U.S.C. § 1002(5), and within the meaning of the National Labor Relations Act ("NLRA") § 2(2), 29 U.S.C. § 152(2). *Id.* ¶ 35.  Ohana was engaged in an industry affecting commerce within the meaning of ERISA § 3(11) and (12), 29 U.S.C. § 1002(11) and (12).  *Id.*

### 2.  Underfunding of the Plan

12.     The Plan has "unfunded vested benefit liabilities."  *Id.* ¶ 30.

13.     As required by applicable regulations, the Plan issued Annual Funding notices in June 2008, June 2009, and November 2009, which stated that the Plan was underfunded for each plan year since the 2006−2007 plan year.  *Id.* ¶¶ 31−32.

### 3.  Sale of the Hotel

14.     On December 31, 2009, AGL entered into a purchase and sale agreement (the "PSA") with Ohana to purchase Ohana's assets, consisting primarily of the Hotel, a retail center across the street from the Hotel known as the "Town Center," and a gas station adjacent to the Town Center.  *Id.* ¶ 17.

15.     Nothing in the PSA required Ohana to solicit further information from the Plan or from BRMS.  *Id.* ¶ 43.  As is potentially relevant to this action, the PSA did not require Ohana to request an estimate of withdrawal liability.  *Id.*

16.     On May 11, 2010, AGL assigned its interests under the PSA to Amstar, and Amstar received the interest in the Hotel assets as part of the assignment.  *Id.* ¶ 19.

17.     Before the sale of its assets, Ohana employed approximately 211 people at the Hotel Hana Maui.  *Id.* ¶ 7.

18.     Ohana had a collective bargaining agreement with Local 5 of UNITE HERE ("Local 5") that required Ohana to make contributions to the Plan for its employees.  *Id.* ¶¶ 18, 36.

19.     Before the sale closed, Ohana terminated all of its employees.  Amstar conducted a job fair open to anyone, at which it solicited employment applications for the positions it intended to fill after the closing.  *Id.* ¶ 9.

20.     The sale closed on May 20, 2010, and certain Hotel assets passed to Amstar, which assumed management of the Hotel.  *Id.* ¶ 20.

3

21.     After the sale of assets, Amstar employed approximately 77 people at the Hotel. *Id.* ¶ 8.

22.     Because, after the sale, over half of Amstar's employees at the Hotel had been represented by Local 5, Amstar recognized Local 5 as the employees' bargaining representative. Amstar did not, however, assume Ohana's bargaining agreement.  Instead, Amstar imposed its own terms and conditions of employment, including its own payroll system and codes, handbook, work rules, job descriptions, pay rates, and benefits such as a new health plan.[2]  *Id.* ¶ 10.

23.     Approximately one year after the sale, Amstar changed the name of the hotel to "Travaasa Hana Hotel."  *Id.* ¶ 20.

### 4.  Withdrawal and Demands

24.     Before the close of sale on May 20, 2010, Amstar sought legal advice on the issue of withdrawal liability related to the purchase of assets from Ohana.  *Id.* ¶ 11.

25.     Eric Gill, a trustee of the Plan, met in person with Amstar's representatives but did not disclose any potential withdrawal liability.  *Id.* ¶ 23.

26.     Ohana ceased contributing to the Plan for work performed after May 10, 2010 and made a complete withdrawal from the Plan on May 20, 2010 pursuant to ERISA § 4203, 29 U.S.C. § 1383, as a result of the sale of assets.  *Id.* ¶¶ 2, 21, 37.

27.     The Plan had full knowledge of Ohana's withdrawal.  *Id.* ¶ 22.

28.     The Plan took no action on the withdrawal liability at issue between January 6, 2011 and early October 2012, when the Plan internally began to consider, or resumed considering, the demand letter and confirmation of the exact amount of withdrawal liability.  *Id.* ¶ 5.

29.     On April 27, 2011, Ohana certified to the State of Hawaii that "all taxes, debt, obligations, and liabilities in the State of Hawaii have been paid and discharged or adequate provision has been made therefore."  *Id.* ¶ 25.

30.     Ohana no longer does business and is unable to pay its withdrawal liability, and the

---

[2] The parties' Joint Stipulation of Facts includes the following purported sentence: "The employees in a Travaasa health plan."  JSF ¶ 10.  The Court's understanding of this stipulation is reflected in the paragraph above.

1    Plan has made no effort to collect the withdrawal liability from Ohana except to write a demand

2    letter to Ohana's last business address in December of 2012.  *Id.* ¶ 26.

3         31.    The Plan made its first claim for withdrawal liability from Ohana on either

4    December 5, 2012 or December 12, 2012.  *Compare id.* ¶ 3 ("The Pension Plan made its first

5    claim for withdrawal liability to and from Ohana Hotel Company, LLC on December 12, 2012.)

6    *with id.* ¶ 21 ("The Plan did not assert withdrawal liability against Ohana until December 5, 2012

7    . . . .") *and id.* ¶¶ 26, 38 (same).  The difference between the two dates is not relevant to the

8    Court's analysis.

9         32.    The Plan made its first claim for successor liability from Amstar on December 5,

10   2012, and never contacted Amstar regarding withdrawal liability or successor withdrawal liability

11   before that date.  *Id.* ¶¶ 4, 6, 39.  The Plan made no effort to notify AGL or Amstar of Ohana's

12   withdrawal liability before the close of sale or at any time before December 5, 2012.  *Id.* ¶ 24.

13        33.    Amstar did not contact the Plan or direct anyone (including Ohana) to contact the

14   Plan to obtain an estimate of withdrawal liability before December 5, 2012.  *Id.* ¶ 44.

15        34.    As stated in its demand letters to Ohana and Amstar, the Plan calculated

16   withdrawal liability in the amount of $757,981, payable in a lump sum or in quarterly installments

17   of $74,566 pursuant to relevant provisions of ERISA.  *Id.* ¶ 40.

18        35.    Amstar made five quarterly withdrawal liability installment payments of $74,556

19   each, totaling $372,780.  *Id.* ¶ 42.

20        **B.    Additional Findings of Fact**

21        36.    The parties agree that the "facts in this case are basically undisputed."  Amstar

22   Opening Br. (dkt. 61) at 2; Plan Reply (dkt. 98) at 1.  Certain facts beyond the parties' Joint

23   Stipulation nevertheless bear on the Court's analysis and require resolution, and are therefore set

24   forth below.  The most significant disputed fact is whether Amstar actually knew that the Plan was

25   underfunded before closing the purchase of the Hotel.

26        37.    BRMS sent annual funding notices for the plan years ending in 2008 and 2009 to

27   Ohana in June and November of 2009, respectively.  Jacobs Decl. (dkt. 86) ¶¶ 14−15 & Exs. C−F.

28   Those notices, which were not returned as undeliverable, disclosed that the Plan was underfunded.

United States District Court
Northern District of California

1    *Id.* ¶¶ 14−15; JSF ¶ 32.

2        38.    Amstar had previously purchased, owned, and operated at least one hotel—the

3    Hilton Pasadena—that participated in a multiemployer pension plan.  Lawrence Decl. (dkt. 87) Ex.

4    A (Finke Dep.) 20:10−21:5, 135:21−23.

5        39.    Amstar admitted that "in previous acquisitions of business concerns or real estate

6    which involve multiemployer pension plans, Amstar has instructed its agents to inquire about

7    whether Amstar could incur liability to a multiemployer pension plan as a result of the

8    transaction."  Lawrence Decl. Ex. F at 5.

9        40.    There is no evidence that the Hilton Pasadena participated in the same Plan at issue

10   here, or that Amstar's experience with that or other hotels otherwise provided Amstar with any

11   knowledge regarding the unfunded vested liabilities of the Plan.

12       41.    On March 4, 2010, attorney Barry Marr of the Hawaii law firm Marr Jones &

13   Wang provided an opinion letter for Amstar regarding "the potential liability to [Amstar] for trust

14   fund contributions under the Agreement between [Local 5] and [Ohana] in the event that Amstar

15   . . . acquires Hotel Hana-Maui."  Lawrence Decl. Ex. G ("Marr Letter") at 1.[3]  Withdrawal liability

16   was among the issues addressed in the letter.  After correctly explaining that withdrawal liability

17   arises "if the pension trust has unfunded vested liability," Marr went on to state that "[a]bsent an

18   express assumption of liability, the Buyer does not assume the [withdrawal] liability," *id.* at 2,

19   which is not consistent with the case law discussed below in the Court's Conclusions of Law.[4]

20       42.    The Marr Letter does not indicate that either Marr or Amstar was aware that the

21   Plan had unfunded vested liabilities.  *See id.*

22       43.    In the late stages of negotiations, the purchase price for the Hotel dropped from $17

23   million to $14.5 million.  Lawrence Decl. Ex. A (Finke Dep.) 51:6−10.  The only evidence in the

24   record regarding the reason for that decrease indicates that it was to account for deferred

25   maintenance, and for no other reason.  *Id.* 51:11−14.  The amendment itself does not discuss

26

27   ───────────────
     [3] The parties stipulated that the Marr letter could be used in resolving this case and that Amstar
     "waives the attorney-client privilege for the [Marr Letter], only."  JSF ¶ 45.

28   [4] The Court notes, and discusses in greater detail below, that much of the relevant case law
     was decided after the date of the Marr letter.

United States District Court
Northern District of California

1    withdrawal liability.

2          44.    The Plan asserts that the reduced purchase price, negotiated relatively soon after the

3    Amstar received the Marr Letter, "raises the possibility that Amstar correctly understood that it

4    could be liable as a successor, and negotiated a reduction in price to address the risk of withdrawal

5    liability to the Plan—withdrawal liability that Amstar knew would be assessed upon Ohana's

6    withdrawal."  Plan Opening Br. (dkt. 84) at 15.  Without any evidence to support it, the mere

7    "possibility" that the reduction was intended to account for withdrawal liability is at best

8    speculative.  The Court finds that the reduced price is not evidence that Amstar had knowledge

9    that the Plan was underfunded and could assert withdrawal liability.

10          45.    The PSA included the following provision requiring Ohana to provide noticed of

11   Plan funding deficiencies to Amstar:

12          **Pension Plan Notices.** To Seller's Knowledge, Seller has provided
            Buyer with copies of all notices of default or notices regarding plan
13          funding deficiency, if any, it has received from the Plan
            Administrator of any multi employer [sic] pension plan covering
14          employees of the Resort or from any other party, including the union
            covering the employees who are participants in the multi-employer
15          pension plan.

16   Lawrence Decl. Ex. B (PSA) at 25, § 7.9.

17          46.    The PSA defined "Seller's Knowledge" restrictively, as follows:

18          **"Seller's Knowledge"** means the current actual (not imputed or
            constructive) knowledge of Roy Goble, Aaron Faust, Mark
19          Stebbings and Dick Wearing (individually and collectively "Seller's
            Representative"), without independent inquiry, and such term shall
20          not include the knowledge of any other person or firm, it being
            understood by Buyer that . . . Seller's Knowledge shall not apply to,
21          or be construed to include, information or material which may be in
            the possession of Seller generally or incidentally, but of which
22          Seller's Representative is not actually aware.

23   *Id.* at 6.

24          47.    The Plan seems to imply in its reply that the narrow definition of "knowledge"

25   suggests foul play by Amstar.  *See* Plan Reply at 4 ("The very limited definition of 'Seller's

26   Knowledge' . . . calls into question the reason for such limiting definition.").  The idea that the

27   definition of "Seller's Knowledge" might have been crafted to avoid the possibility of Amstar

28   obtaining verifiable notice of withdrawal liability is entirely speculative.  A more plausible

United States District Court
Northern District of California

inference is that the definition was written to protect Ohana from liability to Amstar under any one of the PSA's various disclosure requirements. The Court finds that the definition does not support a conclusion that Amstar had knowledge related to withdrawal liability.

48. Despite the requirement that Ohana provide funding deficiency notices to Amstar if one of the four "Seller's Representatives" was aware of them, there is no evidence that Ohana in fact provided any such notices. The only evidence in the record squarely addressing that issue indicates that Ohana did not provide any notices pursuant to section 7.9. Wolf Decl. (dkt. 73) ¶ 6 ("No notices were ever provided to the [Amstar] due diligence team pursuant to this requirement."); Manning Decl. (dkt. 74) ¶ 5.[5]

49. Andrew Wolf, who was a due diligence investigator for Amstar at the time of the sale, states in his declaration that "none of the records [he reviewed] contained any indication that Ohana might be subject to potential withdrawal liability, or that the Plan was underfunded," and that "Ohana representatives were asked if the Plan was underfunded and they stated that to their knowledge it was not." Wolf Decl. ¶ 6.[6] Wolf "was never informed that Ohana or Amstar might incur withdrawal liability from the Plan, or that the Plan was underfunded in any way. *Id.* ¶ 4.

50. Citing no authority, the Plan asserts that the lack of contemporaneous documentation of Ohana representatives disclaiming knowledge of underfunding (as stated in Wolf's declaration) supports an inference that Amstar knew that the Plan was underfunded. Plan Reply at 7. The Court disagrees that such a lack of evidence is itself sufficient to support that

---

[5] The Plan objects to Wolf's and Manning's declarations as to what Amstar did or did not receive from Ohana for lack of personal knowledge. Plan's Objs. to Evid. (dkt. 98-2) at 3−5. Wolf and Manning were members of Amstar's due diligence team, and the Court takes their declarations as representations of what they personally knew in that capacity—i.e., that Wolf and Manning were not personally aware of Ohana providing any notices of underfunding. Regardless, even if the declarations that Ohana failed to provide underfunding notices to Amstar were stricken, there is no evidence that Ohana in fact provided such notices.

[6] The Plan objects to this portion of Wolf's declaration on the basis that Wolf "carefully states [it] in passive voice" and fails to establish foundation or personal knowledge. Plan's Objs. to Evid. at 5. Wolf's participation in the due diligence process is a sufficient foundation for his knowledge on the subject, and the vague passive construction goes to weight rather than admissibility. The Plan also objects that this assertion is hearsay. Because Amstar does not offer either the questions posed to the Ohana representatives nor their responses for the truth of the matters asserted—instead, they go to whether Amstar had notice from Ohana at the time—the declaration is not hearsay. Regardless, even if the declaration were stricken, there is no evidence that Ohana representatives in fact informed Amstar of underfunding.

United States District Court
Northern District of California

1  inference.

2      51.    Christopher Manning, another member of Amstar's due diligence team, also does

3  not recall being informed of underfunding and also states that Amstar never received notices of

4  underfunding pursuant to section 7.9 of the PSA.  Manning Decl. ¶¶ 3, 5.

5      52.    Manning was at the meeting with Eric Gill, the Plan trustee.  Gill did not inform

6  Amstar's representatives of the potential withdrawal liability because he "didn't think of it."

7  Murphy Decl. (dkt. 66) Ex. A (Gill Dep.) 44:24−45:2.  Gill assumed that Amstar would make

8  inquiries of the Plan on that subject.  *Id.* 45:4−6.  The Plan asserts that Manning's failure to ask

9  Gill about the funding status of the Plan "is, at best, curious."  Plan Reply at 7.  Regardless of

10  whether Manning might have been expected to ask Gill about funding, the parties have stipulated

11  that Gill did not disclose that the Plan was underfunded.  JSF ¶ 23.  The Court does not find

12  Manning's failure to ask about funding to be evidence that Manning knew the Plan was

13  underfunded.

14      53.    The Plan also notes that the other two members of Amstar's due diligence team,

15  Joy Berry and Adam Minnick, did not submit declarations.  Plan Reply at 7.  The Court declines to

16  draw any inference from that lack of evidence.  There is no reason to conclude that the Plan could

17  not have deposed Berry or Minnick if it believed that they had relevant information.

18      54.    Mark Stebbings was the general manager of the Hotel both before and after the

19  sale,[7] and is now the general manager of a different Travaasa hotel.  Stebbings Decl. (dkt. 63) ¶¶ 2,

20  3.  He was one of the Seller's Representatives designated in the PSA.  Lawrence Decl. Ex. B

21  (PSA) at 6.  Stebbings states in his declaration that before the sale, he "saw no funding notices

22  from the [Plan], and was never aware that the [Plan] was underfunded or asserting withdrawal

23  liability."  Stebbings Decl. ¶ 3.  After Amstar bought the Hotel, Stebbings "had no idea that the

24  [Plan] was underfunded" or intended to assert withdrawal liability against Amstar until Amstar

25  received the Plan's December 5, 2012 demand letter.  *Id.*

26  _____

27      [7] The Plan objects to Stebbings's entire declaration on the basis that Stebbings fails to specify how long he had been the general manager of the Hotel before the sale.  Plan's Objs. to Evid. at 5.

28  That omission goes to weight rather than admissibility.  The Court's conclusions do not rest on Stebbings having been the general manager for any particular period of time before the sale.

United States District Court
Northern District of California

55.     The Plan asserts that Stebbings's continuity as the general manager of the Hotel before and after the sale "implies knowledge." Plan Reply at 5. The Court disagrees. This case is not analogous to *Golden State Bottling Co., Inc. v. N.L.R.B*, the case on which the Plan relies, because the inference of knowledge there was based on the fact that the manager who continued in his role "had discharged [the plaintiff] and then closely followed the progress of the litigation"— and therefore had actual knowledge of the basis for liability. 414 U.S. 168, 173 (1973). Here, there is no evidence that Stebbings knew the Plan was underfunded. Although the Plan sent annual notices to Ohana, there is no evidence that Stebbings was personally aware of the content of those notices. In other words, even if Stebbings's knowledge is imputed to Amstar, there is no evidence that Stebbings had relevant knowledge to impute.

56.     In November of 2010, several months after the sale of the Hotel closed, BRMS sent an Annual Funding Notice disclosing that the Plan was not fully funded "to all of the Plan's contributing employers." Jacobs Decl. ¶ 16. BRMS decided to include the Hotel in its list of recipients because the Hotel "partially participated in the fund during the plan year." *Id.* ¶ 16 & Ex. H. "The Notice sent to Ohana was not returned to BRMS as undeliverable." *Id.* ¶ 16.

57.     The address that BRMS had on file for Ohana was P.O. Box 10 in Hana, Hawaii. Murphy Reply Decl. Ex. A (Jacobs Dep., dkt. 106-1) 74:16−75:1. In addition to the Hotel's actual street address, which was and remains the Hotel's primary mailing address, Ohana also used P.O. Box 10 as a mailing address. Stebbings Reply Decl. (dkt. 102-3) ¶¶ 3, 4. Amstar did not have access to P.O. Box 10 after the sale, and instead registered P.O. Box 9. *Id.* ¶ 4. Accordingly, this notice did not go to Amstar. Regardless, because the notice was sent several months after closing, whether Amstar received it is not relevant to the question of whether Amstar had notice that the Plan was underfunded before the sale closed.

58.     Anyone could have accessed the Plan's annual funding notices at the BRMS website for the Plan or through Local 5's public website, Jacobs Decl. ¶ 17, but there is no evidence that Amstar did so.

59.     Based on the record as a whole, the Court finds that Amstar did not actually know that the Plan was underfunded when Amstar purchased the Hotel.

III.     CONCLUSIONS OF LAW

    A.     Legal Standards

        1.  Withdrawal Liability

60.     "ERISA, the federal comprehensive private employee benefits statute, includes provisions designed 'to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans.'"  *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1088 (9th Cir. 2015) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984)).

61.     Among these provisions, and intended to prevent a vicious cycle of withdrawal from multiemployer pension plans, is the Multiemployer Pension Plan Amendment Act ("MPPAA," 29 U.S.C. §§ 1381−1453), which, under certain circumstances, imposes "withdrawal liability" on an employer that withdraws from an underfunded plan.

62.     Disputes regarding withdrawal liability under the MPPAA generally must be resolved through arbitration.  29 U.S.C. § 1401(a); *see, e.g.*, *Teamsters Pension Tr. Fund—Bd. of Trs. of W. Conference v. Allyn Transp. Co.*, 832 F.2d 502, 504 (9th Cir. 1987) (holding that even questions of statutory interpretation fall within the MPPAA's arbitration mandate).  The parties agree that if Amstar is liable as a successor to Ohana, Amstar may demand arbitration of the Plan's calculation of withdrawal liability.  JSF ¶ 41.  The Court's task here is only to determine whether Amstar can be held liable as a successor.

63.     Neither party suggests that the question of whether Amstar is a successor to Ohana should be arbitrated.  That issue has generally been addressed by the courts.  *See generally, e.g.*, *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079 (9th Cir. 2015); *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841 (7th Cir. 2015); *Hawaii Carpenters Tr. Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289 (9th Cir. 1987).  Although often unstated in the case law, the rationale for this approach appears to be that if a purchaser is not, in fact, a successor within the meaning of the doctrine, the purchaser is not subject to the MPPAA and thus not bound by the statute's arbitration provision.

United States District Court
Northern District of California

### 2.  Successor Liability

64.     "In the fields of labor and employment law, federal courts have developed a common-law doctrine of successorship liability that 'provides an exception from the general rule that a purchaser of assets does not acquire a seller's liabilities.'"  *Resilient*, 801 F.3d at 1090 (quoting *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995)).

65.     Under this doctrine, "businesses that are substantial continuations of entities with such obligations" remain liable for them even after a bona fide purchase, "so long as the successor had notice of the liability." *Id.* at 1090, 1095.  "'The inquiry [in these successorship cases] is [therefore] not merely whether the new employer is a "successor" in the strict corporate-law sense of the term. The successorship inquiry in the labor-law context is much broader.'" *Id.* at 1090 (quoting *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 781 (9th Cir. 2010)) (alterations in original).

66.     Until its *Resilient* decision in September of 2015, the Ninth Circuit had "not previously decided whether a successor employer can be subject to MPPAA withdrawal liability." *Id.* at 1093.  Based on precedent applying the labor law successorship doctrine to delinquent ERISA contributions, however, the Ninth Circuit held that it extends to withdrawal liability as well, rejecting the employer's argument that the underlying policy and structure of the MPPAA weighed against imposing broad successor liability. *Id.* at 1093−95.  Before *Resilient*, the Seventh Circuit and a handful of district court decisions had reached the same conclusion. *Id.* at 1095 n.4 (citing, e.g., *Chi. Truck Drivers*, 59 F.3d at 49; *Auto. Indus. Pension Tr. Fund v. S. City Ford, Inc.*, No. C 11-04590 CW, 2012 WL 1232109, at *2 (N.D. Cal. Apr. 12, 2012)).

67.     "Because the origins of successor liability are equitable, fairness is a prime consideration in its application." *Id.* at 1091 (quoting *Sullivan*, 623 F.3d at 781).

68.     Neither party has cited any authority regarding the burden of proof in cases where successor liability is disputed.  Amstar's opening brief asserts without citation that "the burden of proof required to establish that [Amstar] is a successor should fall squarely on the [Plan], the party asserting successor status." Amstar Opening Br. at 12.  Counsel for the Plan suggested at the

hearing that the burden is on Amstar, because Amstar initiated this action as the plaintiff seeking declaratory judgment.

69.     In the context of patent law, the Supreme Court has rejected the Plan's argument that an action for declaratory judgment affects the burden of proof.  *See generally Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843 (2014).  Because "the burden of proof is a substantive aspect of a claim" and the Supreme Court has "long considered the operation of the Declaratory Judgment Act to be only procedural, leaving substantive rights unchanged," the Court reversed a Federal Circuit case holding that a declaratory judgment plaintiff had the burden of proving non-infringement (as opposed to regular infringement cases, where the patent holder bears the burden of proving infringement).  *Id.* at 849 (citations and internal quotation marks omitted).  In the Supreme Court's view, "[s]imple legal logic, resting upon settled case law," compelled the result that the same party—the patent holder—should bear the burden regardless of whether an action is brought for declaratory judgment of non-infringement or for damages for infringement. *Id.* Following the reasoning of *Medtronic*, the question here turns on which party normally bears the burden of proof in successorship cases, without regard for the fact that this particular case began with Amstar seeking declaratory judgment.[8]

70.     Courts have generally held, albeit outside the context of labor and employment law, that "[b]ecause the 'general rule' is that a purchaser of assets does not assume the predecessor's liability, it follows that the proponent of successor liability must offer proof that one of the . . . exceptions to the general rule applies."  *Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp.*, 635 F.3d 48, 52 (2d Cir. 2011); *see also Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 266 (7th Cir. 1996).  The Court finds that reasoning sound and applicable to the case at hand.  The labor and employment successorship doctrine is a broader exception to the general rule than applies in other areas, but it is still an exception.  The Court accordingly holds that it is the Plan's burden to prove that Amstar meets the criteria for successor liability.

---

[8] The Court need not address in detail the procedural complexity that would result from the Plan's position, but it is not clear whether the Plan would have the Court apply different burdens of proof to the same basic questions in the context of Amstar's declaratory judgment claim as compared to the Plan's declaratory judgment counterclaim.

* * *

71.     Amstar presents three arguments why it should not be liable as a successor to Ohana, each of which the Plan disputes: (1) that the Plan's claim is barred by laches; (2) that Amstar did not have actual notice of any withdrawal liability; and (3) that there was not sufficient continuity of the business of the Hotel to find successorship.  The Court addresses these arguments in turn.

**B.     Amstar's Laches Defense Is Subject to Arbitration**

72.     Amstar argues that the Plan's claim is barred by the doctrine of laches, because the Plan waited more than thirty months after withdrawal to notify Amstar of its demand—including approximately twenty-two months during which the parties' stipulated that the Plan "took no action," JSF ¶ 5—and Amstar's right to indemnity from Ohana and Ohana's members expired during that period.  Amstar Opening Br. at 21−23.  For the reasons discussed below, the Court holds that this defense to MPPAA withdrawal liability falls within the MPPAA's mandatory arbitration provision.

73.     The MPPAA provides that an underfunded plan must calculate and demand payment of withdrawal liability "[a]s soon as practicable after an employer's complete or partial withdrawal."  29 U.S.C. § 1399(b)(1).  "Congress did not set a fixed time during which a pension fund's trustees must calculate the employer's withdrawal liability . . . .  Congress' adoption of a looser 'as soon as practicable' requirement for the initial determination of withdrawal liability bespeaks a deliberate legislative choice to afford some flexibility in gathering the information and performing the complex calculations necessary to make that assessment."  *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 204−05 (1997).  The Supreme Court has held that "if an employer believes the trustees have failed to comply with their 'as soon as practicable' responsibility, the employer may assert that violation as a laches objection at an arbitration contesting the withdrawal liability assessment."  *Id.* at 205.  In other words, the statute's "as soon as practicable" clause incorporates the equitable doctrine of laches.

74.     "To establish laches a defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself."  *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir.

14

United States District Court
Northern District of California

1    2000).  If established, laches may bar a claim in its entirety.  *See, e.g.*, *Danjaq LLC v. Sony Corp.*,

2    263 F.3d 942, 963 (9th Cir. 2001).

3        75.    As suggested by *Bay Area Laundry*, a number of decisions have held that

4    arbitration is the appropriate forum for a laches defense to MPPAA withdrawal liability, and based

5    on that principle have further held that an employer who fails to demand arbitration waives its

6    laches defense.  *E.g.*, *Giroux Bros. Transp. v. New Eng. Teamsters & Trucking Indus. Pension

7    Fund*, 73 F.3d 1, 4 (1st Cir. 1996) ("[A]ny dispute regarding the timeliness of the Fund's demand

8    under § 1399(b)(1) is statutorily committed to arbitration in the first instance."); *Vaughn v. Sexton*,

9    975 F.2d 498, 501−02 (8th Cir. 1992); *Operating Eng'rs' Pension Tr. Fund v. Clark's Welding &

10   Mach.*, 688 F. Supp. 2d 902, 909 (N.D. Cal. 2010).  The Court must therefore consider whether it

11   is appropriate to decide the question of laches now, or if the issue should be left to an arbitrator to

12   resolve in the first instance (assuming for the moment that the Plan succeeds in proving that

13   Amstar can be liable as a successor to Ohana).

14       76.    The Ninth Circuit has emphasized the scope of the MPPAA arbitration clause,

15   albeit not in the context of laches: "the statute states unambiguously that '*[a]ny* dispute between

16   an employer and the plan sponsor . . . concerning a determination made under sections 1381

17   through 1399 . . . shall be resolved through arbitration' (29 U.S.C. § 1401(a)(1)), and Congress

18   clearly intended exactly what those words import."  *Allyn Transp.*, 832 F.2d at 505−06 (ellipses

19   and emphasis in original).

20       77.    Because the "as soon as practicable" requirement is found in 29 U.S.C. § 1399, the

21   Court agrees with Judge Conti's decision in *Clark's Welding* that it falls within the plain language

22   of the arbitration provision, and a laches defense must generally be arbitrated in the first instance.

23   *See Clark's Welding*, 688 F. Supp. 2d at 909.

24       78.    Amstar argues, however, that it need not arbitrate its laches defense because it has

25   not yet been determined to be a successor employer:

26           [T]his case is not ripe for arbitration, and Amstar is not claiming a
             laches defense under the MPPAA since Amstar has not been
27           determined to be a successor employer subject to the MPPAA.  That
             question is to be determined by this court.  To the contrary, Amstar
28           is asserting that the inexcusable delay by the [Plan's] Trustees in

> assessing withdrawal liability justifies a laches defense to the treatment of Amstar as a successor employer for withdrawal liability in the first case.

Amstar Reply (dkt. 102) at 16.

79.     Amstar's position would be more persuasive if Amstar asserted that the Plan's delay specifically prejudiced Amstar's ability to defend against the imposition of successor liability.  If, for example, Amstar could point to evidence that had been lost or witnesses no longer available who would have been important to its argument that it lacked notice of Ohana's withdrawal liability, equity might require the Court to consider a laches defense in the current posture of the case.  Amstar does not, however, present any such argument in its briefs.

80.     Instead, Amstar argues it was prejudiced because "Ohana went out of business . . . leaving Amstar as the sole target for the [Plan] to attempt to recoup the withdrawal liability." Amstar Reply at 17.  Under the PSA, Amstar's right indemnity by Ohana, including the right to pursue assets distributed to Ohana's members after Ohana's dissolution, survived for only one year, which expired during the period of the Plan's purportedly unreasonable delay.  Amstar Opening Br. at 22–23.

81.     Whether Amstar was prejudiced in its ability to recover indemnity from Ohana for withdrawal liability to the Plan would be relevant even if Amstar's status as a successor were not in dispute.  Under such circumstances, Amstar's laches defense would clearly be a question for arbitration. *See Clark's Welding*, 688 F. Supp. 2d at 909.

82.     The fact that Amstar has chosen to challenge successorship does not give rise to any principled reason to depart from Congress's intent to resolve MPPAA disputes by arbitration in the first instance—including disputes regarding the timing of a plan's demand. *See id.; Allyn Transp.*, 832 F.2d at 505–06.  In the Court's view, unless the laches defense bears specifically on the question of whether a purchaser is a successor, the better course is to resolve successorship first.  If the purchaser is held to be a successor, it remains free to assert laches in arbitration, just as it could have if it had not challenged successorship.[9]  If not, there is no liability, and any question

---

[9] Counsel for the Plan agreed at the hearing that Amstar would be able to raise a laches defense in arbitration if the Court determined that Amstar could be liable as a successor to Ohana.

United States District Court
Northern District of California

United States District Court
Northern District of California

of laches as to the underlying withdrawal claim is moot.  Addressing laches first creates a potential incentive for a successor with a preference for a judicial forum to assert a weak challenge to successorship merely as pretext to have a court decide a laches defense that Congress entrusted to arbitration.  The Court therefore declines to address the merits of Amstar's laches argument, except to hold that Amstar has asserted no prejudice affecting its ability to challenge successorship.

83.     Amstar offered an expert report by Mitchell Hofing to support its claim that the Plan's delay in demanding payment was unreasonable.  *See* Hofing Decl. ¶ 3 & Ex. A.  The Plan moves to strike Hofing's report as not having been timely disclosed.  *See* Plan's Mot. to Strike (dkt. 100).  Because the Court does not reach Amstar's laches defense, the Plan's motion is denied as moot.

## C.     Amstar Lacked Notice of Liability

84.     In considering whether a bona fide successor can be subject to an order by the National Labor Relations Board requiring reinstatement of an employee and back pay, the Supreme Court noted that, "[s]ince the successor must have notice before liability can be imposed, 'his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices.'" *Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 185 (1973).

85.     In *Resilient*, the Ninth Circuit construed *Golden State Bottling* as holding "that successor employers would be held liable *only* when they took over the business with notice of the liability," for the reasons the Supreme Court stated.  *Resilient*, 801 F.3d at 1092−93 (emphasis added).  Accordingly, in reaching its conclusion that successor liability applies to MPPAA withdrawal liability, the Ninth Circuit held that it applies only "so long as the successor had notice of the liability." *Id.* at 1095.  Because the district court had not reached the issue of notice— instead holding that there was not adequate continuity between the business before and after the sale to support successorship—the *Resilient* opinion does not discuss the contours of the notice requirement in any detail.  *See generally id.*

United States District Court
Northern District of California

### 1.  Amstar Lacked Actual Knowledge of Liability

86.     The Court concludes that the Plan has not proven by a preponderance of the evidence that Amstar had actual notice of Ohana's withdrawal liability.  To the extent that the Plan argues that actual notice of liability can be inferred from the record, the Court disagrees as stated above in the Court's Findings of Fact.  Amstar had no actual notice of this liability when it purchased the Hotel.

### 2.  Amstar Lacked Actual Knowledge of "Contingent Liability"

87.     The Plan further argues that "Amstar should have gone looking for" the annual funding notice that revealed the Plan's underfunding, and "had *at least* constructive notice that the withdrawal liability would accrue."  Plan Opening Br. at 16, 18.  According to the Plan, "[b]ecause the underfunded status of the plan was so readily discoverable, and the ability to obtain an estimate of withdrawal liability was a statutory right, it is appropriate to hold Amstar responsible for the liability even without proof of more."  *Id.* at 20.  Essentially, the Plan argues that Amstar should be held liable if it *should have known* about the withdrawal liability, even if it did not actually know.  Amstar argues that actual notice is required, and is not met here.  Amstar Reply at 8.

88.     As far as the Court is aware, neither the Ninth Circuit nor any district court within the Ninth Circuit has yet addressed that issue.  The Plan relies on the Seventh Circuit's recent decision in *Tsareff v. ManWeb Services, Inc.*, which held that notice of "the precise amount of withdrawal liability" is not necessary to impose successor liability, and instead that "notice of contingent withdrawal liability" is sufficient.  794 F.3d 841, 846−47 (2015); *see* Plan Reply at 8−10.

89.     The facts of *Tsareff* demonstrate significantly greater knowledge of potential liability than in the case at hand.  There, an owner of the buyer who was actively involved in the purchase "discussed unfunded pension liabilities with the President of [the seller] because he 'knew that the pension was short of money.'"  *Tsareff*, 794 F.3d at 847.  He also testified that "the asset sale was 'not a transaction that [he] specifically wanted to do' because he 'under[stood] the underfunded portion of the pension fund' and 'knew of the associated risk of 'potential liability.'"

18

*Id.* at 847−48 (alterations in original).  Moreover, the asset purchase agreement in that case

"expressly stated that . . . [the seller] was subject to certain liabilities imposed by ERISA and the

MPPAA, including '*the share of the [P]lan's unfunded vested liabilities allocable to [the seller]*

*upon withdrawal* from the union or termination of the plan for which [the seller] may be

contingently liable," explicitly acknowledging that the plan in that case had unfunded vested

liabilities.  *Id.* at 848 (emphasis and alteration to capitalization in original).[10]

90.     As reflected in the Court's Findings of Fact above, Amstar did not have actual

knowledge of even the "contingent withdrawal liability" discussed in *Tsareff*, which the Court

understands to mean knowledge of the facts giving rise to such liability—perhaps most

importantly, that the Plan was underfunded.

### 3.  Lack of Diligence Is Not a Substitute for Actual Knowledge

91.     Whether a buyer's lack of diligence can satisfy the notice requirement for successor

liability has rarely been addressed by the courts.

92.     The Seventh Circuit noted but declined to resolve the issue in a 1986 decision:

> [T]here looms large, understandably, the question whether the
> purchaser of the assets enjoyed timely actual knowledge of the claim
> and a potential liability. We are not prepared to hold that absence of
> timely actual knowledge is a bar to successor liability in every case.
> We are surely not prepared to hold it is never a bar. The question is
> whether a judicial doctrine should be created, focusing perhaps on
> the diligence or lack of diligence of a successor in making inquiry
> prior to purchase, or perhaps on the development of indemnification
> rights in the successor as against the predecessor entity.
>
> . . . However, in the present case, in which the absence of any timely
> actual knowledge on the part of the successor is so clear, in which
> substantial, while not complete, relief from the predecessor is
> available to the victim, and in which the ownership of the
> predecessor and of the successor is totally distinct, we refrain from
> subjecting the doctrine of successor liability to judicial surgery on
> the scale which would be necessary to permit [the employee
> plaintiff] to obtain relief from [the purported successor defendant].
> More generally, the national dimensions of the dilemma we have
> described in this opinion are likely to be explored more adequately
> and responded to more effectively by Congress than by the courts.

---

[10] In contrast, the PSA in this case merely required Ohana to provide any notices of
underfunding that it had received, and did not indicate that any such notices existed or that the
plan was in fact underfunded.  *See* Lawrence Decl. Ex. B (PSA) at 25, § 7.9.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1237 (7th Cir. 1986).

2       93.     The parties have identified only two cases actually resolving whether the notice

3 requirement for successor liability can be met by a purchaser's lack of diligence in determining the

4 seller's liability—i.e., a standard based on what the purchaser should have known rather than

5 actual knowledge: *Trustees of Chicago Plastering Institute Pension Trust v. Elite Plastering Co.,*

6 *Inc.*, 603 F. Supp. 2d 1143 (N.D. Ill. 2009), and *RKN Concrete Construction, Inc. v. Laborers'*

7 *Pension Fund*, No. 13 C 9153, 2015 WL 18885113 (N.D. Ill. Apr. 24, 2015). Both cases held that

8 lack of diligence is not a substitute for actual knowledge.

9       94.     The *Elite Plastering* court construed the Seventh Circuit's decision in *Wheeler* as

10 "explicitly reject[ing] the imposition of an across-the-board due diligence inquiry," and

11 admonishing district courts to leave any such imposition to Congress. *Elite Plastering*, 603 F.

12 Supp. 2d at 1152.[11] The court acknowledged Seventh Circuit precedent holding that actual

13 knowledge of claims made against the seller triggered a duty of the buyer to inquire as to the status

14 of those claims, but found no such knowledge evident from the record before it, and accordingly

15 granted summary judgment in favor of the purported successor. *Id.* (citing *EEOC v. Vucitech*, 842

16 F.2d 936, 945 (7th Cir. 1988)).

17       95.     In *RKN Concrete*, the court relied on *Elite Plastering* for the principle that "[w]here

18 a purchaser lacks knowledge of a specific claim, 'courts should refrain from subjecting the

19 doctrine of successor liability to judicial surgery through a due diligence requirement.'" *RKN*

20 *Concrete*, 2015 WL 1888513, at *6 (quoting *Elite Plastering*, 603 F. Supp. 2d at 1151). The *RKN*

21 *Concrete* court did not conduct its own analysis of whether such a requirement should be imposed,

22 and also granted summary judgment in favor of the purported successor. *Id.*

23       96.     As far as this Court is aware, however, no court—anywhere—has ever held that a

24 subsequent employer can be held liable for a predecessor's ERISA obligations that it merely

25

26       [11] This Court is not persuaded that the Seventh Circuit's holding in *Wheeler* was as clear cut as
the Northern District of Illinois construed it in *Elite Plastering*. The *Elite Plastering* decision is

27 nevertheless relevant as one of the only cases considering whether due diligence is relevant to the
knowledge requirement for successor liability, particularly given the apparent absence of any

28 authority to the contrary.

1    should have known about, unless the employer actually knew at least the factual basis for the

2    liability.

3        97.    The Court declines to do so here.  Under the law as it currently stands, a buyer must

4    have actual notice of at least the factual basis for MPPAA withdrawal liability at the time of

5    purchase if the buyer is to be held liable under a theory of successor liability.  Because Amstar

6    lacked such notice, it cannot be held liable.

7                   **4.   Amstar Acted Diligently Under the Circumstances**

8        98.    Even if the law were changed to impose a duty of inquiry and allow liability to

9    arise from a buyer's lack of diligence, the Court finds that Amstar's investigation was adequate

10   under the circumstances of the purchase.  To start, the Court addresses Amstar's understanding of

11   its responsibilities at the time, and whether that understanding was reasonable.  The Court then

12   turns to Amstar's conduct in light of that understanding.

13       99.    In a letter addressing a number of pension-related issues, Amstar's local Hawaii

14   counsel Barry Marr advised Amstar that a buyer does not assume any withdrawal liability that the

15   seller might owe unless the buyer expressly agrees to do so.  Lawrence Decl. Ex. G.  There is no

16   question that the Marr Letter does not accurately describe the law as it stands following the Ninth

17   Circuit's decision in *Resilient*, but whether Amstar's reliance on the Marr Letter was reasonable

18   depends on the state of the law at the time.

19       100.   At the time that Amstar purchased the Hotel in 2010—more than five years before

20   the Ninth Circuit decided *Resilient*—it was not clearly established in this jurisdiction that the

21   doctrine of successor liability at issue here applied to MPPAA withdrawal liability.  The Ninth

22   Circuit, as noted above, stated explicitly that it had not addressed the issue before that case.  *See*

23   *Resilient*, 801 F.3d at 1093.  In holding that the doctrine does apply in this context, the Ninth

24   Circuit rejected a number of arguments by the defendant related to the structure and purpose of the

25   MPPAA.  *Id.* at 1093−94.  In the present case, the Plan itself characterizes the Ninth Circuit's

26   opinion in *Resilient* as a "landmark decision," suggesting that its holding was not a foregone

27   conclusion.  Plan Opening Br. at 1.

28       101.   The doctrine was particularly uncertain when Amstar purchased the Hotel in 2010,

United States District Court
Northern District of California

at which point, as far as this Court is aware, *no* court within the Ninth Circuit had considered the issue.  Of the handful of district court cases so holding in the years between the Hotel purchase and the Ninth Circuit's *Resilient* decision, none cite any in-circuit authority addressing the issue before Amstar bought the Hotel.  *See, e.g.*, *Operating Eng'rs & Pension Tr. Fund v. W. Power & Equip. Corp.*, No. C 10-4460 PJH, 2011 WL 1153300, at *3 (N.D. Cal. Mar. 28, 2011); *S. City Ford*, 2012 WL 1232109, at *2.  In *Resilient*, the district court—which the Ninth Circuit later reversed on the issue of continuity—found "no need to resolve the question of whether in the construction industry context a 'successor employer' can be liable for the MPPAA withdrawal liability of a company which is no longer operating in the industry."  *Resilient Floor Covering Pension Fund v. Michael's Floor Covering*, No. 11-5200 JSC, 2012 WL 8750444, at *8−10 (N.D. Cal. Nov. 1, 2012), *rev'd*, 801 F.3d 1079 (9th Cir 2015).  That decision did not cite any case applying the successor liability doctrine to MPPAA withdrawal liability, and, by explicitly declining to reach the issue, implicitly acknowledged that it was unsettled at the time, at least with respect to the construction industry.  *See id.*

102.    Based on the arguments raised and decisions rendered in those cases, it does not appear to have been entirely clear before the Ninth Circuit's *Resilient* decision in 2015 that the Ninth Circuit would follow the Seventh Circuit in applying successor liability in the context of MPPAA withdrawal liability.  Although each district court within the Ninth Circuit to resolve the issue in the intervening years between 2010 and 2015 held that successor liability applies, each did so over arguments that it should not, none cited pre-2010 in-circuit precedent squarely on point, and one court expressly declined to reach the issue.

103.    Based on the state of the law at the time, the Court cannot conclude that Amstar should have known at that time that the advice in the Marr Letter was incorrect—i.e., that it could face withdrawal liability as a successor without agreeing to assume such responsibility.

104.    Amstar took some steps to investigate the financial state of the Plan.  Its due diligence team asked Ohana representatives whether the Plan was underfunded, and they responded that, to their knowledge, it was not.  Wolf Decl. ¶ 6.  The PSA required Ohana to provide any notices of underfunding that its designated representatives were aware of, and Ohana

1    provided no such notices, which was consistent—from Amstar's perspective—with the Plan not

2    being underfunded.  *Id.*; Manning Decl. ¶ 5.

3           105.    Amstar certainly could have done more.  It could have reviewed Plan documents

4    publicly available on the internet, asked Ohana to provide all Plan notices rather than rely on

5    Ohana to parse whether the notices revealed unfunded liabilities, or reached out to the Plan

6    directly.  But if Amstar reasonably believed that withdrawal liability would not transfer to a bona

7    fide purchaser, it was reasonable for it to conduct the limited investigation that it did, and to focus

8    its resources instead on the myriad other due diligence considerations relevant to the purchase.

9           106.    The Plan's expert report, by Douglas Johnston, does not change the Court's

10   conclusions.  *See generally* Johnston Report (dkt. 85).[12]  The report appears generally to assume

11   that Amstar knew or should have known that withdrawal liability attaches to a successor, and to

12   examine Amstar's conduct in light of that assumption.  Johnston does not discuss the state of the

13   law in 2010.

14          107.    One of Johnston's opinions is "that Amstar should have, in the exercise of

15   reasonable diligence, and with knowledge of the existence of the CBA, inquired as to the

16   implications of the purchase of an asset from an employer withdrawing from a multiemployer

17   pension plan."  *Id.* at 2.  Johnston does not address the fact that Amstar made exactly that inquiry

18   to Marr, and received the response that it would not be liable for any withdrawal liability.  *See id.*;

19   *see also* Lawrence Decl. Ex. G (Marr Letter).

20          108.    Johnston also candidly admits that he "do[es] not regard [him]self as an expert in

21   hotel management, labor unions, collective bargaining agreements, ERISA and/or PBGC issues,

22   nor . . . in similarly technical and/or statutory employment-related matters."  Johnston Report at 4.

23   His extensive expertise in mergers and acquisitions outside of that specialized context, *see id.* at 3,

24   might still be relevant in determining how Amstar should have acted with respect to an established

25   risk, but provides no basis for Johnston to assume or opine on whether Amstar should have known

26   that the federal labor law successorship doctrine encompassed withdrawal liability.

27   _____

28          [12] Amstar moves to strike Johnston's report.  *See* dkt. 104.  In the Court's view, Amstar's
     critiques go to weight rather than admissibility.  The Court therefore declines to strike the report.

United States District Court
Northern District of California

109.   Because Amstar reasonably relied on Marr's advice as discussed above, Johnston's analysis—which assumes an established doctrine of successor liability—is not persuasive.

110.   The Court need not decide whether Amstar's due diligence would have been sufficient if the transaction had occurred after the *Resilient* decision, or even after the district court decisions that reached the same result between 2010 and 2015.  Before those decisions were rendered, however, it was reasonable for Amstar to accept its counsel's advice that a successor does not inherit withdrawal liability.  In light of that advice, Amstar's limited investigation of the state of the Plan was also reasonable.  Accordingly, even if a failure to conduct due diligence could substitute for actual notice, the Court finds that the Plan has failed to prove by a preponderance of the evidence that Amstar should have known of Ohana's contingent liability, and finds no failure to conduct adequate due diligence.

**D.     Continuity in Operation of the Hotel Would Be Sufficient to Find Successorship**

111.   Because Amstar lacked actual notice of the facts giving rise to withdrawal liability, Amstar cannot be held liable as a successor and the Court need not resolve the question of whether there was sufficient continuity between Ohana's and Amstar's operation of the Hotel.  In an abundance of caution, the Court nevertheless addresses that issue.  For the reasons stated below, the Court concludes that Amstar could be liable as a successor if, counterfactually, it had sufficient knowledge of the liability.

112.   In general, the factors relevant to "whether the new business is a successor of an old business" are as follows, although they are not exhaustive:

> [Whether] there has been a substantial continuity of the same business operations[;] [whether] the new employer uses the same plant; [whether] the same or substantially the same work force is employed; [whether] the same jobs exist under the same working conditions; [whether] the same supervisors are employed; [whether] the same machinery, equipment, and methods of production are used; and [whether] the same product is manufactured or the same service [is] offered.

*Resilient*, 801 F.3d at 1090−91 (quoting *N.L.R.B. v. Jeffries Lithograph Co.,* 752 F.2d 459, 463 (9th Cir. 1985)) (alterations in original).  Cases also consider "whether the body of customers is the same," a factor the Ninth Circuit emphasized in *Resilient*.  *Id.* at 1091, 1095.  The factors

United States District Court
Northern District of California

24

1    emphasized should depend on the purpose for which successor liability is sought to be imposed

2    and on the facts of the case.  *See id.* at 1091.

3          113.    It is worth noting that although Amstar argues in its opening brief that these factors

4    favor finding a lack of successorship, it does not address successorship in any way in its reply,

5    instead focusing only on its arguments regarding laches and lack of notice.  Amstar's counsel also

6    declined to address this issue at the hearing, despite the Court's tentative ruling that Amstar would

7    be a successor to Ohana if it had actual notice.

8          114.    The first factor, substantial continuity, includes many of the considerations also

9    listed separately.  *See id.* at 1095.  Here, based in part on the more specific analysis below, there

10   was substantial continuity because Amstar continued to run a hotel on the same property that

11   Ohana had, using the same general manager, with employees who had mostly worked for Ohana,

12   and originally under the same name.

13         115.    Amstar argues that it does not "use the same plant" because it upgraded the

14   facilities and outsources certain operations (and thus the facilities enclosing them) like laundry

15   facilities, restaurants, and retail stores to third parties.  *See* Stebbings Decl. ¶ 6.  Ultimately,

16   however, Amstar still uses the same hotel buildings that Ohana did, the same pool, the same

17   restaurant space, and the same grounds.  Lawrence Decl. Ex. A (Finke Dep. 122:24−125:11).  This

18   factor favors finding successorship.

19         116.    Next, "the appropriate test for determining 'continuity of the workforce' is whether

20   'a majority of the new workforce once worked for the old employer,' not whether the successor

21   employs a majority of the predecessor's workforce."  *Resilient*, 801 F.3d at 1098 (quoting *Jeffries*

22   *Lithograph*, 752 F.2d at 464).  Amstar admits that "most of the 77 employees hired by [Amstar]

23   previously worked for Ohana."  Amstar Opening Br. at 18.  This factor favors finding

24   successorship.

25         117.    Whether "the same jobs exist under the same working conditions" is a closer call.

26   After Amstar reduced the staffing of the hotel, employees were called on to "wear multiple hats"

27   more often than under Ohana's management.  *See* Stebbings Decl. ¶ 9.  Amstar's focus on

28   adventure travelers rather than luxury also likely required employees to perform some tasks not

United States District Court
Northern District of California

United States District Court
Northern District of California

required by Ohana. There is evidence that some "conditions" of employment changed in the sense that Amstar issued new job descriptions and enrolled employees in new benefits packages. *See id.* ¶¶ 7, 9. On the other hand, the bulk of employees' responsibilities for managing a hotel remained this same, because Amstar continued to run a hotel out of the same facility as Ohana with mostly former Ohana employees. *See* Lawrence Decl. Ex. A (Finke Dep. 125:23−126:25). This factor is neutral.

118. Amstar admits that it employed the same general manager as Ohana and "a few [other] former Ohana supervisors were hired to supervise similar functions." Amstar Opening Br. at 19; *see also* Finke Dep. 87:21−88:11, 89:21−90:5. Despite Amstar also hiring or bringing in additional supervisors, the Court finds the former managers and supervisors who remained sufficient for this factor to favor finding successorship.

119. The factor addressing "machinery, equipment, and methods of production" is not particularly applicable to the operation of a hotel. The Plan observes that under the PSA, Amstar acquired the equipment, linens, dishware, and other personal property that Ohana used at the Hotel. Plan Opening Br. at 13 (citing Lawrence Decl. Ex. B at 8, § 2.1(c), (d)). Amstar argues that its new marketing and branding approach are relevant to this factor, perhaps—although it is not clear in Amstar's brief—as "methods of production." *See* Amstar Opening Br. at 20. Amstar also ceased using equipment at facilities that it outsourced, *see* Stebbings Decl. ¶ 10, but does not dispute that of the equipment it continued to use, much of it came from Ohana. To the extent that this factor is relevant, it favors finding successorship.

120. As for whether the same service was offered, ultimately, Amstar still offered guests a hotel on the beach in Hana and various amenities during their stay. *See* Lawrence Decl. Ex. A (Finke Dep.) 122:24−123:10. Amstar's addition of "adventure" activities such as archery was no so transformative as to sway this factor in Amstar's favor.

121. In *Resilient*, the Ninth Circuit held that "whether the successor deliberately takes over 'basically the same body of customers'" is of particular importance in considering successorship for withdrawal liability *in the construction industry*. 801 F.3d at 1095 (quoting *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 43 (1987)). The industry is important

United States District Court
Northern District of California

because the MPPAA include a special exception to withdrawal liability for the construction industry, declining to impose liability on an employer who completely ceases work and withdraws from the market, because under those circumstances other employers will presumably take on the same customers and continue to pay into the union pension plans. *Id.* at 1095−96. The Ninth Circuit determined that if a purported successor did not intentionally capture the predecessor's customers, the change would approximate a complete withdrawal for the purpose of the exception, and imposing withdrawal liability on the successor would not be appropriate. *See id.*

122.    Whatever may be said about the Ninth Circuit's rationale, the construction industry exception does not apply to hotel operators, so it is not clear that capturing the same customers is particularly relevant here. It is also not clear what the "same customers" would mean in this context, because there is no evidence in the record to determine the extent to which the hotel industry relies on repeated customers. If, for example, hotels in Hawaii do not often have the same individuals return for multiple stays, it might be more telling to look at whether the predecessor and successor both cater to, say, each year's college spring break crowd, or couples on honeymoons, or a particular annual business conference, than to look at whether individual guests have stayed in the hotel before.

123.    Other than relatively abstract statements by Amstar employees regarding Amstar's shift towards adventure vacations, the only evidence offered regarding continuity of customers is a declaration Adam Hawthorne setting forth a chart of the number of return customers each year from 2011 through 2015. Hawthorne Decl. ¶ 4. The chart is supported by the conclusory statement that Hawthorne is a Travaasa employee and "ha[s] determined the number of guests who visited the hotel property operated by Ohana in Maui, Hawaii from January 1, 2007 to December 31, 2010 and who returned as guests to the property operated by Travaasa . . . ." *Id.* ¶¶ 1−2. The Plan moves to strike Hawthorne's declaration for lack of foundation and personal knowledge. The Court agrees that the declaration must be stricken, leaving no evidence regarding repeat customers.[13] Based on the lack of relevant and admissible evidence, and taking into account that

---

[13] Even if Hawthorne's declaration were allowed to stand, it provides no baseline of Ohana's reliance on returning customers in its normal course of business before the sale. Without that

27

the special significance warranted in construction industry cases does not apply here, this factor is essentially neutral. If anything, the fact that the Hotel continued to serve vacationers in Hana tends to support finding successorship. That Amstar continued to operate the Hotel under the same name for a year after the purchase, *see* JSF ¶ 20, also supports the conclusion that Amstar intended to capture Ohana's market share.

124. The Plan's Reply includes the following characterization of Amstar's purchase:

> A hotel, operating under the same name, with the same general manager, with mostly the same employees, with the same physical buildings, the same number of rooms, the same pool and spa and beach, cannot credibly be found to have a lack of continuity because the marketing plan changed and archery was newly offered.

Plan Reply at 17. The Court agrees. Amstar is a successor to Ohana, and if it had had notice that the Plan was underfunded, it could have been held liable for Ohana's withdrawal liability.

## IV.   CONCLUSION

125. For the reasons stated above, the Court finds that Amstar did not have actual notice before it purchased the Hotel of the factual basis underlying the Plan's withdrawal liability claim—i.e., that the Plan was underfunded—and holds that absent such notice, Amstar cannot be held liable as a successor. Accordingly, the Plan must return the $372,780 that Amstar has paid.

126. Judgment will be entered in favor of Amstar. **The parties are instructed to submit a stipulated form of judgment consistent with the Court's decision no later than February 24, 2016.** The Plan's consent to a form of judgment shall not be construed as waiving any objection to or right to appeal the Court's decision on the merits. If the parties are unable to agree to a form of judgment, they may submit separate proposals without briefing.

**IT IS SO ORDERED.**

Dated: February 10, 2016

JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California

---

information, it is impossible to judge the significance of the number of returning customers after Amstar purchased the hotel.

28